**FEDERAL DISTRICT COURT FOR THE STATE OF MICHIGAN**

**WESTERN DIVISION**

BRENDA TRACY,

     Plaintiff,

                                        Case No. 25
                                        The Honorable

v.

BOARD OF TRUSTEES OF MICHIGAN STATE UNIVERSITY,

DENNIS DENNO and REMA VASSAR, current members of the BOARD OF
TRUSTEES of Michigan State University, in their personal and official capacity, jointly and
severally,

     Defendants,

---

Karen Truszkowski (P56929)
TEMPERANCE LEGAL GROUP
Attorney for Plaintiff
503 Mall Court # 131
Lansing MI 48912
844.534.2560
karen@temperancelegalgroup.com

---

## <u>COMPLAINT AND JURY DEMAND</u>

     Plaintiff Brenda Tracy, by and through her attorney, Karen Truszkowski, hereby files the

following complaint against Defendants as captioned above

## INTRODUCTION

1. Brenda Tracy is a nationally recognized survivor's advocate and speaker. She takes her experience as a gang-rape survivor and uses it to educate people across the country about preventing sexual violence and sexual misconduct. Among many other honors and recognitions, Tracy's advocacy led to being named one of Sports Illustrated Most Powerful Women in Sports for the year 2020.

> Introducing our list of the most powerful, most influential, and most outstanding women in sports right now—the game-changers who are speaking out, setting the bar and making a difference.[1]

2. In 2022, ESPN named her one of "The 11 biggest power brokers and advocates shaping the future of college football."[2]

3. At the request of university athletic coaches, athletic directors, and administration, Tracy worked with more than 100 colleges and universities to speak to student athletes and coaches about sexual violence and sexual misconduct prevention. In 2022, after reporting sexual misconduct that she experienced herself at the hands of a highly paid, prominent university football coach, Tracy's speaking engagements all but disappeared. Her reputation is forever tarnished.

4. After Tracy's identity was wrongfully and intentionally disclosed to local media and the public-at-large, Tracy is subject to ongoing threats and harassment to herself and her family. Not only did Defendants' malfeasance contribute to the disclosure of Tracy's

---

[1] SI Staff, *The Unrelenting*, Sports Illustrated (October 6, 2020), https://www.si.com/sports-illustrated/2020/10/06/the-unrelenting-women-in-sports-daily-cover
[2] The 11 biggest power brokers and advocates shaping the future of college football - ESPN

identity, but Defendants have also done nothing to address the harassment, and indeed Defendant's nonfeasance continues to escalate the harassment.

## THE PARTIES

5.  Plaintiff Brenda Tracy (Tracy) has a bachelor's degree in nursing and a master's degree in business and healthcare management. She is a speaker, activist, and advocate for sexual violence and sexual misconduct survivors. She resides in the State of Oregon.

6.  Defendant Michigan State University Board of Trustees (MSU BOT) is the governing body for Michigan State University (MSU.)  MSU is a public land–grant university formed by the Michigan State Legislature.[3]  MSU acts through its authorized agents and employees, including principally, the members of its Board of Trustees, and its administrative staff, including the President, General Counsel, Athletic Director, and other administrative personnel.

7.  Defendant Rema Vassar is a duly elected member of the MSU BOT. She is named individually in her personal and official capacity.

8.  Defendant Dennis Denno is a duly elected member of the MSU BOT. He is named individually in his personal and official capacity.

## JURISDICTION AND VENUE

9.  At all times relevant herein, Plaintiff Tracy was a resident of the State of Oregon.

10. At all times relevant herein, Defendant MSU and the Board of Trustees conducted business in Ingham County in the Western District of the Federal Court of Michigan.

11. Jurisdiction is based on diversity of citizenship and federal question 42 U.S.C. § 1983

---

[3] MICH. CONST. art. VIII, § 5. Pursuant to Article VIII, § 5 of the Constitution of the State of Michigan ("Michigan Constitution"),

12. The amount in controversy exceeds the jurisdictional amount of $75,000.

13. This court has supplemental jurisdiction over state law claims arising under statutory and common law pursuant to 28 U.S.C. § 1338(b) because those claims are joined with substantial and related claims under federal law. The court also has subject matter jurisdiction over those claims pursuant to 28 U.S.C. § 1367, because Plaintiff's state law claims are interrelated with Plaintiff's federal claims and arise from a common nucleus of operative facts such that the adjudication of Plaintiff's state law claims furthers judicial economy.

## FACTUAL ALLEGATIONS

14. In February 2020, MSU football coach Mark Dantonio (Dantonio) resigned from his position as head football coach of the MSU Spartans Football team.

15. On February 12, 2020, MSU Athletic Director William Beekman (Beekman) hired Tucker, then head coach at the University of Colorado Boulder, (Colorado) to become head coach of the MSU Spartans Football team.

16. Tucker earned the nickname "Midnight Mel" when he left Colorado in the middle of the night after having a fundraiser for Colorado knowing he would be leaving for a new coaching position at MSU.[4]

17. In 2019, Tucker allowed a college football player convicted of criminal assault and disorderly conduct to transfer to Colorado. Tucker was among thirty-three coaches featured in a USA Today article about athletes that commit sexual assault and are allowed to continue to play sports.[5]

---

[4] https://www.youtube.com/watch?v=BIHkgCqqbAE
[5] Predator Pipeline | Home | USA TODAY NETWORK

18. MSU paid $3 million dollars to Colorado to buy out the remainder of Tucker's contract.

19. Upon information and belief, nobody from MSU or the search firm enlisted by Beekman contacted Colorado to inquire as to Tucker's history while at Colorado, or any other previous employer.

20. Tucker's starting salary with MSU was worth $5.5 million dollars per year for six years.

21. Tucker's record at MSU was 9-2 for the 2020-2021 season and 11-2 for the 2021-2022 season with a win at the Chic-fil-A Bowl.

22. Tucker invited Tracy to MSU three times. The first visit was on August 14, 2021, to speak with the incoming university football team and the football staff. MSU paid Tracy $10,000 for her appearance. With Tucker sitting in the front row, Tracy told the audience her personal horror story of a brutal gang rape in 1998 at Oregon State University. During that visit, Tucker and Tracy discussed Tracy's return to the MSU campus.

23. After their meeting in August 2021, Tucker and Tracy developed a professional friendship based upon their mutual interests in sports advocacy. This relationship was primarily by phone as the two lived on opposite coasts. Tracy made it expressly clear that this was a professional relationship and there would never be a romantic relationship. Tracy relied on Tucker's representation to her that he understood, and he would not pursue anything further.

24. While the two discussed personal family and mental-health issues, Tracy had no interest in a romantic relationship with Tucker.

25. Tucker began sending Tracy photos of Tracy he found on her Instagram page with admonitions such as "this is the one."

26. Tucker and Tracy talked approximately twenty-seven times between August 2021 and April 2022.

27. Tucker initiated the single FaceTime video call between them. Tucker appeared shirtless from his home bedroom making Tracy visibly uncomfortable.

28. On a November 2021 call, Tucker asked Tracy "if I wasn't a football coach and I wasn't married, would you date me?" Tracy told Tucker she would not as they worked together, and she was careful not to become romantically involved with coaches.

29. On a December 1, 2021, call, Tracy again expressly told Tucker they would only be friends to which Tucker seemingly agreed.

30. On December 2, 2021, Tracy texted her friend and business manager Ahlan Alvarado (Alvarado) about the call with Tucker.[6]



---

[6] Ahlan Alvarado and Brenda Tracy were best friends for more than twenty years.  Tragically, on June 19, 2023, Ahlan died after a fatal car crash in Arizona. Ahlan gave her statement to the Investigator before she died.

31. Tracy returned to MSU for the spring game (Spring Game) on April 16, 2022. Tracy was the Honorary Captain, and the game was dedicated to her non-profit Set the Expectation (STE) and Survivors of Sexual Violence and Misconduct (SSVM). Tucker and Tracy met in Tucker's campus office and later went to dinner the evening before the Spring Game, accompanied by Tracy's travel companion, Alvarado.

32. During this visit, Alan Haller, (AD Haller) then the Athletic Director for MSU, approached Tracy alone and asked her "how are things going with you and Coach Tucker? Is everything okay?" Tracy found this inquiry to be strange and out-of-place.[7]



---

[7] AD Haller was terminated from MSU.  His last day was May 11, 2025.
[8] Photograph of Tracy at the spring game, referenced in paragraph 31.

33. After the Spring Game Tracy and Alvarado went back to their East Lansing hotel where they shared a room. That evening Tucker called Tracy four times asking Tracy if she would meet him without Alvarado, suggesting he could come to their hotel through the back entrance to "avoid being seen."

34. Tracy declined Tucker's invitation in the presence of Alvarado.

35. Tracy told Tucker that she did not want to meet with him alone. Tracy told Tucker that Alvarado was also concerned about Tucker's request.

36. Tucker's response was "what does she think we're gonna do, have sex?"

37. Tracy realized then that Tucker had brought her to MSU under false pretenses. Despite Tracy setting clear boundaries multiple times, it was clear to Tracy that he brought her there for nefarious reasons, none of which were related to raising awareness and honoring survivors of sexual violence and misconduct.

38. On April 28, 2022, Tucker called Tracy twice from a Florida hotel where he was staying for a work-related charity function. The Spartan Fund paid for the visit and Tucker took an MSU donor plane to Florida.

39. The call (CALL) lasted thirty-six minutes. At first, the CALL discussion seemed friendly, cordial, and professional, as their previous calls had been. Tracy again attempted to set boundaries with Tucker and reiterate that they were just friends.

40. Tucker was aware that Tracy would soon be attending a conference with Tucker's now ex-wife. Given Tucker's behavior at the spring game, Tracy became especially uncomfortable. Tracy expressed her discomfort. In a harsh tone, Tucker snapped at Tracy and said "don't worry about her [his wife]" as if it was none of Tracy's business.

41. Tracy was concerned that Tucker would become angry about Tracy "rejecting him."    To lighten the conversation Tracy sent Tucker a photograph taken at the spring game. Tucker originally told the Investigator that he had no recollection of Tracy sending him any photographs.

42. Tracy provided the photo to the Investigator. Tucker "remembered" the photograph after the Investigator showed it to him.

43. Tucker characterized the photograph as provocative. He has weaponized this photograph of Tracy wearing everyday athleisure apparel into Tracy trying to entice him. Tucker repeatedly describes the photograph as Tracy wearing "tight leather pants."



---

[9] Photo of Tucker and Tracy wearing "tight leather pants" as referenced in paragraphs 41-43.

44. During the call, Tucker's tone of voice suddenly changed, prompting Tracy to become concerned and ask Tucker "what are you doing?"

45. Tucker responded that he was laying in bed with a hard dick "touching himself."

46. Tracy became aware that Tucker was masturbating on the call without Tracy's knowledge or consent. At no time during the call did Tracy participate in the masturbation. Tracy expressed that "if you do this, I don't ever want to talk about it again. I don't ever want to hear about it, we are only friends, that's it." During the investigation, Tucker admitted to masturbating on the phone.

47. Tucker maintains that he and Tracy were in a "mutually consensual and intimate relationship," and what he alone characterized as phone sex resulted from the intimate relationship.

48. Tracy had no interest in a romantic relationship or participating in the "phone sex."

49. Tracy was in shock and disbelief by the realization that Tucker was masturbating on the phone without her consent. Tracy was in a trauma-induced freeze response rendering her unable to respond or hang up the phone.[10]

50. On May 24, 2022, Tracy texted to Tucker "Hey there when you have some time over the next week or two can we chat about my visit in July?" Tucker did not respond.

51. Tracy was scheduled to return to MSU on July 25, 2022. Despite Tracy's team-visit itinerary, flight, rental car, and hotel being booked and finalized, Tucker canceled that visit on July 22, 2022. The visit was not rescheduled.

---

[10] The freeze response, or tonic immobility, is a commonly understood reaction to trauma and the resulting triggers. Jen Percy, *What People Misunderstand About Rape*, The New York Times (August 22, 2023), https://www.nytimes.com/2023/08/22/magazine/immobility-rape-trauma-freeze.html

52. Despite Tucker's insistence that the two were in a "mutually consensual and intimate relationship," Tucker and Tracy did not speak again for ninety-six days.

53. Their next phone call was on August 2, 2022, when Tucker called Tracy and accused Tracy and Alvarado of "gossiping" about his marital problems. Tucker denied that he had done anything wrong and characterized himself as the victim. His tone was angry and threatening.

54. During the call, Tucker said "I'll be fine, it's you that I'm worried about," a reference to earlier discussions where Tracy told Tucker that if anything even looked remotely inappropriate between them, Tucker would survive the scandal, but Tracy would not.

55. Tracy felt the call was meant as a threat to destroy Tracy and her reputation.

56. Tucker and Tracy never spoke again.

57. Tracy immediately called the three people she trusted the most: Tracy's long-time legal counsel in Oregon, Tracy's therapist, and Tracy's best friend and business manager Ahlan Alvarado.

58. Tracy decided that she needed to address what had happened to remain true to her mission to hold people accountable for sexual violence and sexual misconduct. In November 2022, Tracy decided to report Tucker's misconduct.

59. Through her legal counsel, Tracy contacted MSU general counsel Brian Quinn (Quinn). The message communicated to Quinn was that Tracy wanted to bring Tucker's misconduct to MSU's attention. Tracy emphasized that she did not want the matter to be public, she wanted the university process to proceed pursuant to university guidelines, and most importantly that she was not seeking any specific remedy for the misconduct. She simply wanted Tucker to be accountable for his sexual misconduct and threats.

60. After Tracy reported Tucker's conduct to MSU through Quinn, as a mandatory reporter Quinn was required to report the conduct to MSU's Title IX office.

61. Tracy made an informed and independent decision to file a complaint with the MSU Office of Institutional Equity (OIE) in December 2022. Contrary to Tucker's misrepresentations, Tracy did not make a monetary demand of the general counsel before filing the complaint, and at no time was Tracy encouraged or discouraged from filing a complaint by any party. It was solely her decision.

> "Notably, Claimant [Tracy] only filed her complaint after [Tucker] broke off their personal relationship (because she was gossiping about their relationship in breach of his trust), and her attorney unsuccessfully tried to get a payoff from the University."[11]

62. Defendants have done nothing to refute the false claims that Tracy's attorney "unsuccessfully tried to get a payoff from the University" leaving Tracy subject to increasing harassment.

63. After evaluating Tracy's claims against Tucker, OIE retained the services of an outside party, Rebecca Veidlinger, (Investigator) to investigate and prepare a report. After the Investigator completed her investigation, and a hearing was held, a neutral Resolution Officer (RO) would determine if there were any RVSM policy violations. Both Tucker and Tracy were notified of the investigation and given mutual no-contact orders.[12]

64. In January 2023, Veidlinger met with and interviewed Tracy, and six individuals Tracy identified as witnesses. Three of those witnesses were Tucker's assistants involved in arranging and then canceling Tracy's visits.

---

[11] Final Investigative Report, attachment 30, Letter from counsel for Respondent to investigator dated April 6, 2023.
[12] In the RVSM process Tucker is referred to as the respondent and Tracy the claimant.

65. The remaining three witnesses were the individuals Tracy contacted immediately after the August 2022 phone call: Tracy's long-time legal counsel in Oregon, Tracy's therapist, and Tracy's best friend and business manager Ahlan Alvarado. All three of those witnesses expressed to the investigator that Tracy was distraught about the April 2022 and August 2022 phone calls when she contacted them.

66. Tracy and her witnesses completed their part in the investigation by the end of January 2023.

67. Tracy would later learn from the Investigator that Tucker had deleted his social media, texts, and phone records. Upon information and belief, Tucker deleted his social media, texts, and phone records contrary to MSU policy and instructions to Tucker to maintain those records.

68. In January 2023, Tucker submitted a letter to the Investigator objecting to MSU's assertion of jurisdiction over the complaint and investigation.

69. Tucker asserted that MSU did not have jurisdiction to investigate what he characterized as a "purely personal relationship."  OIE determines jurisdiction.

70. Tucker did not meet with the Investigator until March 22, 2024.

71. Mat Ishbia (Ishbia) is an MSU donor and a major contributor to Tucker's salary. Ishbia is the owner and CEO of United Wholesale Mortgage (UWM).

72. On March 23, 2023, Tucker, Vasser, and Ishbia flew on Ishbia's private jet to a basketball game at Madison Square Garden (MSG Trip).

73. Unbeknownst to Tracy, David Zacks, general counsel to UWM, had been privy to the investigation since December 22, 2022. Zacks was copied on all correspondence regarding the investigation.

74. MSU's own investigation found that the MSG Trip created the potential for an apparent if not actual conflict of interest for Vassar.[13]

75. MSU's own investigation also found that "at the time of Chair Vassar's travel to New York, the Board of Trustees was aware that Mr. Tucker was under investigation for alleged sexual harassment."[14]

76. An inference could be made that during the MSG Trip Tucker, Vassar, and Ishbia discussed the OIE investigation and ostensibly, Tracy's identity as the claimant.

77. Unbeknownst to Tracy or her counsel, Tucker retained Brett Sokolow as an expert witness to prepare a report that stated that the university did not have jurisdiction to investigate "off-duty" activities of an employee. Brett Sokolow's identity was not disclosed to Tracy until June 2023.

78. MSU's RVSM states that parties may propose medical or scientific experts. Brett Sokolow is neither a medical nor a scientific expert and under the RVSM policy his report should not be considered. Despite the RVSM policy precluding this type of expert witness, OIE and the Investigator accepted its submission as part of the investigation.

79. Tucker's counsel disclosed the existence but not the identity of the "expert witness" to Tracy's counsel. Tracy's counsel discerned who the expert witness was based upon her knowledge of the limited pool of experts in this area. Tucker then falsely accused the Investigator of disclosing the expert witness's identity to Tracy's counsel.

---

[13] https://msu.edu/-/media/assets/msu/docs/issues-statements/msu-independent-investigation-report--feb-28-2024--redactedupdated-links.pdf?rev=6e36cfca79374c28b9d81e4baacc0706&hash=483929D1FD6EC34599D00C3B77E870A2
[14] *Id.*

80. Misrepresentations in the expert's analysis destroyed the credibility of his entire report. The RO did not allow the report into evidence. Notably, Tucker continues to put the expert report forward as evidence that MSU OIE lacks jurisdiction over the matter.

81. To date, MSU has not addressed the Sokolow report publicly.

82. OIE determined that jurisdiction was appropriate as Tucker's conduct on April 28, 2022, interfered with Tracy's ongoing business relationship with MSU.

83. Tucker also submitted multiple lengthy briefs that were contrary to the RVSM policy.

84. Upon information and belief, defendants allowed the lengthy briefs and did not instruct Tucker as to whether the briefs complied with the RVSM policies. Tracy had no reasonable opportunity to respond to the expert report or the disallowed briefs.

85. Tucker's version of events contradicted Tracy's as he asserted that their relationship was of a personal intimate nature, and that they had both agreed upon and actively participated in the April 2022 masturbation call Tucker himself characterized as "mutual phone sex."

86. Tracy made it clear that their relationship was not intimate or romantic and she did not consent to or participate in the April 2022 masturbation call.

87. Tucker made other false representations during the investigation. Among those false representations was that Tracy told Tucker she was looking for a 'sugar daddy' to pay her a monthly amount of $4000 to be his girlfriend and that she would be "all over him" if he was not married. Tracy never made any such comments.

88. Tucker told the Investigator he was in his East Lansing residence when he made the April 28, 2022, CALL. This was false.

89. The Investigator obtained records from MSU showing that Tucker was not home but in Naples FL at the Greg Montgomery Golf Outing, his expense report noted the trip purpose

was administrative, paid for by the Spartan Fund, and that he flew to Florida on an MSU donor's private plane.

90. Tucker told the Investigator that an unidentified "associate" told Tucker that ESPN investigator Paula Lavigne was investigating the veracity of Tracy's gang rape story. Lavigne expressly denies that this was true.

> "Neither (Tracy's) organization nor Tracy is or has been the target of any investigative reporting. I'm perplexed that Mel Tucker would respond to a complaint of sexual harassment by involving me or ESPN. "[15]

91. Tucker told the Investigator that the unidentified "associate" also told Tucker that Alvarado was "gossiping" about Tucker's marriage. In her interview with the Investigator, Alvarado expressly denied ever gossiping or otherwise discussing anything regarding Tucker.

92. Despite multiple opportunities to provide the identity of the unidentified "associate" providing this critical evidence, the mystery "associate" remains unidentified.

93. Tucker contradicted himself again when he stated that he did not cancel Tracy's scheduled July 25, 2022, visit to MSU but that he merely postponed the visit to January 2023. However, he had previously told the Investigator that he did have a role in canceling the July 25, 2022, visit, he did not recall any mention of a January 2023 visit, and that a January visit would not make sense anyway as new players did not arrive until spring.

94. Tucker accused the Investigator of bias against Tucker, and men in general.

95. In May 2023, Tucker submitted a list of 170 perceived problems with the initial draft report and demanded that the Investigator interview Tracy again. Tucker stated that "[A] fair

---

[15] Mike Freeman, *In the Michigan State Story, Brenda Tracy is the believable one. Not coach Mel Tucker.*, USA Today (September 10, 2023, at 8:01 pm ET), https://www.usatoday.com/story/sports/columnist/mike-freeman/2023/09/10/michigan-state-coach-mel-tucker-isnt-believable-brenda-tracy-is/70818026007/

process would expose Tracy's allegations as nothing more than another agenda-driven attempt to defame [Tucker] and the University."

96. The Investigator accommodated Tucker's demand and on June 6, 2023, interviewed Tracy again. In total, Tracy spent close to eight hours with the Investigator. Tucker would later admonish the Investigator for meeting with Tracy even though it was at Tucker's request.

97. On June 15, 2023, a Final Draft Report (FDR) was issued for the parties' review and commentary.

98. On June 19, 2023, Alvarado passed away.

99. On July 25, 2023, the Final Investigative Report (FIR) was released to the parties. The FIR was to remain confidential and distributed only to select members of the MSU community. It was not a public document.

100. After the FIR was issued, Tucker again presented multiple objections to the factual findings in the FIR.

101. Per RVSM policy, a hearing was scheduled with a (RO) to take place in August 2023. Tucker objected to scheduling the hearing in August, and requested that it be scheduled in October, during the MSU football team's bye-week.[16]  MSU OIE accommodated this request.

102. MSU's Relationship Violence and Sexual Misconduct policy (RVSM) states that MSU will

"[K]eep private the identity of any individual who has made a report or formal complaint of prohibited conduct under this Policy; the identity of any claimant; the identity of any respondent, and the identity of any witness."[17]

---

[16] A bye week in college sports (especially football) is a week during the season in which the team does not play a game.
[17] MSU Relationship Violence & Sexual Misconduct and Title IX Policy, Sec. IX, September 26, 2023.

103. It was important to Tracy that the complaint process was not influenced or tainted by outside entities, requiring the parties' identities to remain confidential.

104. Tracy detrimentally relied on the RVSM policy and multiple assurances that her identity would not be disclosed as she intended for the investigation to remain confidential until it was finished.

105. Based upon the possibility that her identity would be disclosed, and other violations of the RVSM policy, Tracy shared relevant documents with USA Today journalist Kenny Jacoby (Jacoby), with the agreement that the story was off-the-record and would not be published until Tracy told Jacoby that he could publish it.

106. Tucker's counsel verified with the Investigator that the MSU BOT would not be notified of the investigation until the FIR was released on July 25, 2023, contradicting the finding in the Miller Chevelier Report (MC Report) that stated that the trustees were aware of the OIE investigation during the MSG trip on March 23, 2023.

107. On July 25, 2023, notably the same day the FIR was issued, OIE notified Tracy that at least two media outlets, Crain's Detroit Business and The City Pulse, had inquired about the existence of an investigation into Tucker's alleged sexual misconduct and his potential termination. Tracy had no idea that there had been any discussion about Tucker's potential termination.

108. An inference can be made that the existence of the FIR was intentionally and wrongfully disclosed by an MSU affiliated person thereby exposing Tracy's identity.

109. The Jones Day report (JD Report) stated that Dan Murphy (Murphy) of ESPN was the first reporter to submit a Freedom of Information Request (FOIA) request to MSU. Murphy

did not submit a FOIA until July 30, 2023, requesting any OIE investigations in which Tucker was a respondent.

110. This was five days *after* the July 25, 2023, inquiry from Crain's Detroit Business and The City Pulse asking if Tucker was going to be terminated for sexual harassment.

111. Ishbia is affiliated and has direct connections with Crain's Detroit Business.

112. Former MSU trustee Brian Mosallum (Mosallum) has direct connections with Crain's Detroit Business.

113. Upon information and belief, other former and current board members of the MSU BOT also have direct connections and affiliations with Crain's Detroit Business.

114. On August 2023, Vassar appeared in a photo alongside former MSU BOT Trustee Mosallam.

115. Mosallam nominated Vassar for the Crain's Notable Leaders in Higher Education Award, which Vassar received on August 14, 2023.[18]

116. On August 24th, 2023, OIE emailed Tracy that a news story could be imminent.

117. Learning about the July and August media inquiries confirmed to Tracy that there was a strong likelihood that her identity would become public.

118. Tracy had reason to be concerned about the disclosure of her identity. After the start of the MSU Big-Ten football season, her worst fears materialized.

---

[18] *Meet Crain's Notable Leaders in Higher Education*, Crain's (Aug. 14, 2023)

119. On September 8, 2023, during a Friday night MSU home football game, Tracy's counsel was contacted by a local journalist (Journalist A) who informed her that Tracy's identity had been disclosed earlier that day to Journalist A and other local journalists.

120. Tracy's counsel later learned that earlier that day there was a gathering of media, MSU board members, administration, and other high-ranking MSU officials at the MSU Kellogg Center.

121. The source of the leak was at the Kellogg Center gathering.

122. Tracy's counsel confirmed that Tracy's identity was circulating among local and national media outlets and would soon be public. Tracy's counsel, not Tracy herself, made the final decision to tell Jacoby to proceed with his story, as it was critical that Tracy be able to explain the circumstances on her own terms as supported by the case documents.

123. Tracy's hand was forced, and she had to protect herself. Jacoby's story ran Sunday September 10, 2023, at 12:45 am ET.[19]

124. Tracy's counsel contacted Quinn to inform him that Tracy's identity was public, Tracy was not the source of the leak, that it was someone associated with MSU, and Tracy would be taking steps to protect herself.

125. On Sunday, September 10, 2023, Tracy's counsel emailed Quinn a draft statement (Draft Statement) that Tracy would be issuing to the media.

---

[19] Kenny Jacoby, _Michigan State football coach Mel Tucker accused of sexually harassing rape survivor_, USA Today (September 10, 2023, at 12:45 am ET), https://www.usatoday.com/story/news/investigations/2023/09/10/michigan-state-football-coach-sexual-harassment-claim/70679703007/

126. The Draft Statement designated as confidential clarified that Tracy's identity was leaked by someone other than Tracy, and that the "leaker" was someone affiliated with MSU, likely a MSU board member.

127. Before releasing the Draft Statement to the media, Tracy's counsel removed the reference to the leak coming from a MSU board member stating instead that the source of the leak was someone associated with MSU. Tracy released the revised statement later that day.

128. After Tracy's identity was disclosed and Jacoby's story ran in USA Today, rumors and speculation rapidly circulated about the previously confidential OIE investigation, as well as the source of the leak of Tracy's name. Tracy was falsely accused of leaking her own name, exposing her and her family to heightened threats of violence.

129. On Sunday, September 10, 2023, MSU held a press conference in the administrative meeting room in the MSU football stadium. Athletic director Alan Haller (AD Haller) and the Interim President Teresa K. Woodruff (Woodruff) announced at the press conference that Tucker was suspended without pay pending the sexual misconduct investigation. Per AD Haller,

> The university's formal conclusion of the investigation will occur once a hearing and final decision processes are complete, and the university's main goal remains focused on conducting a fair, thorough, and unbiased investigation.[20]

130. This announcement again increased the threats against Tracy.

---

[20] Ryan O'Bleness, *MSU's Alan Haller, Teresa Woodruff give update on Mel Tucker investigation.*, Rivals: Spartans Illustrated (September 10, 2023), https://michiganstate.rivals.com/news/msu-s-alan-haller-teresa-woodruff-give-update-on-mel-tucker-investigation

131. On Monday, September 11, 2023, a State News reporter (Journalist B) who had the Draft Statement in their possession contacted Tracy's counsel, confirming that there was a leak connected to the board. This Journalist B specifically asked which board member was the leak.

132. Ironically, the Draft Statement regarding the leak of Tracy's identity was leaked by someone at MSU.

133. The same day, Tucker's agent Neil Cornrich issued a press release stating that "Tracy's allegations are "completely false," and the proceedings against him [Tucker] are "devoid of any semblance of fairness."[21]

134. Tucker made another baseless assertion in his September 11, 2023, statement that the proceeding was a sham, and that he was deprived of the ability to explain his case or present substantive evidence of his innocence. Both parties had seven months to gather and present evidence.

135. In addition to his false assertions that Tracy's allegations were untrue, Tucker went on to say that he "can only conclude that there is an ulterior motive designed to terminate my contract based on some other factor such as a desire to avoid any Nasser (sic) taint, or my race or gender."[22]

136. Tucker's false allegations again increased the mounting threats against Tracy. She felt that her life was in danger.

---

[21] Yousef Nasser, *Mel Tucker calls harassment allegations 'completely false' in statement*, ABC 12 News (September 11, 2023), https://www.abc12.com/sports/mel-tucker-calls-harassment-allegations-completely-false-in-statement/article_a95f5920-50ec-11ee-b9c0-df9247d9e567.html

[22] Kenny Jacoby and Matt Mencarini, *Michigan State University football coach Mel Tucker denies sexually harassing Brenda Tracy*, USA Today (September 11, 2023, at 7:26 pm ET), https://www.usatoday.com/story/news/investigations/2023/09/11/mel-tucker-denies-sexual-harassment-claims/70828433007/

137. On or about September 11, 2023, Vassar had a text exchange about Tracy with former MSU Trustee Patrick O'Keefe.

138. During that text exchange O'Keefe stated that "you probably have grounds to fire Woodruff. Cover up.  Someone can argue due process, but this stuff gets out and the University again looks weak since somebody else is spilling the beans."  O'Keefe went on to state that Tracy was "spilling confidential matter to the media. She does this because either she isn't going to participate in the October hearings so she is lobbing a Hail Mary bomb maybe to get back to her rapers (sic) previously or she doesn't trust the Title IX process and wants to extract her own revenge (on who I am not saying I don't know.) After, Vassar told O'Keefe, "I need to talk to you," O'Keefe replied "Call me. I think you have ground to fire TW (Woodruff). Title 9 office reports solely to her and she doesn't know the details of the Tucker investigation. Not believable."[23]

139. The defendants never addressed the disparaging and false remarks exchanged between O'Keefe and Vassar.

140. Upon information and belief, Tucker used an MSU jet under the pretext of recruiting trips but instead he was meeting with other women.

141. Upon information and belief, Tucker had numerous other inappropriate interactions and incidents with other women victims, before and during his time as coach at MSU. These interactions include:

      A.  Sexual misconduct by Tucker with female employees and staff; [24]

---

[23] Deadspin | Troubling texts between former, current MSU trustees shed new light on Mel Tucker sexual harassment allegations

[24] USA TODAY lawsuit reveals allegations that Tucker abused assistant, MSU staff - The State News

B.  Inappropriate relationship with a female journalist from a local Lansing television station.

C.  Interactions with female employees of an area country club where Tucker was a member, resulting in Tucker being banned from the club, and non-disclosure agreements (NDA) with the female employees.

D.  Inappropriate interactions with female coaches in the MSU athletic department.

E.  Inappropriate interactions and harassment of a woman who was a professional colleague during Tucker's time in Colorado.

142. Tucker requested that AD Haller grant Tucker medical leave under the Family and Medical Leave Act (FMLA). Tucker did not disclose a medical basis for the request.

143. On September 18, 2023, AD Haller issued a public Notice of Termination letter to Tucker. Tucker had until September 26, 2023, to submit reasons why he should not be terminated for cause.

144. On September 19, 2023, MSU announced that they retained the Jones Day Law Firm (Jones Day) to investigate who disclosed Tracy's identity and who leaked the Draft Statement to the State News. Jones Day released its findings in a report dated December 29, 2023.

145. The Jones Day report confirmed that someone leaked the Draft Statement to the State News, and the pool of potential leakers was limited to twelve people. The twelve people were the eight MSU Board Trustees, the Board secretary, Interim President Theresa Woodruff, the President's Chief of Staff Michael Zeig, and MSU spokesperson Emily Guerrant.

146. The Jones Day report found that general counsel Quinn gave minimal details to the MSU BOT at the outset and throughout the OIE investigation. This is contrary to the findings in the

MC Report which found that "at the time of Chair Vassar's travel to New York (in March 2023) the Board of Trustees was aware that Mr. Tucker was under investigation for alleged sexual harassment."

147. Upon information and belief, Quinn told the Board of Trustees that the complainant. was a vendor, drastically limiting the pool of potential victims.

148. The JD report confirmed that some of the reporters interviewed during the Jones Day investigation deduced the identity of the complainant on their own once they were aware of the OIE investigation.

149. The JD report found that at least 35 individuals were aware of the OIE Investigation, and 29 of those 35 knew Tracy's identity before the media disclosed it publicly.

150. Jones Day could not identify a specific source of the leak connected to the defendants; the report did not expressly eliminate anyone as the source.

> "Despite our investigative efforts, we have been unable to identify anyone associated with MSU who made an unauthorized disclosure of confidential information that led to the media's awareness of the OIE Investigation or the complainant's identity."[25]

151. Vassar stated that the JD report "fully exonerated" her. JD did not exonerate anyone.[26] The report simply stated that JD could not identify who disclosed confidential information.

152. The JD report also stated that defendant Denno refused to be interviewed for the investigations, and refused to allow Jones Day to inspect his phone, which Jones Day believed contained information relevant to the leak investigation.

---

[25] Law firm finds no evidence MSU officials or employees leaked name of Tucker accuser
[26] The Oxford Dictionary defines exonerated as absolve (someone) from blame for a fault or wrongdoing.

153. Denno and Vassar retained independent legal counsel for the Jones Day Investigation.

154. As reported by ESPN on November 21, 2023, defendants had sufficient cause to terminate Tucker in March 2023, but made an affirmative choice not to terminate him.[27]

155. Instead, defendants waited until 6 days before the RVSM hearing scheduled for October 5 and 6, 2023 to terminate Tucker for cause. The defendants issued a termination letter stating

> "It is immaterial if, as you allege, these actions were purportedly consensual and somehow occurred outside of your workplace. As the University previously stated, '[i]t is decidedly unprofessional and unethical to flirt, make sexual comments, and masturbate while on the phone with a University vendor.'"[28]

156. Defendants stated that "new developments" gave them cause to terminate Tucker.

157. If defendants were committed to due process for all the parties, they would have waited until the RVSM investigation was completed to terminate Tucker.

158. Defendants' announcement that they had terminated Tucker escalated the threats and harassment directed to Tracy. The letter was purposely non-committal and did not affirmatively state that Tucker's actions were non-consensual. Had defendants waited to terminate Tucker until after the investigation concluded—they could have stated affirmatively that Tucker had sexually harassed and exploited Tracy.

159. Tracy was on the receiving end of vicious attacks on her personally and professionally. Tracy's co-workers, friends, and family also endured these attacks. Tracy soon realized that not only was she being threatened by unknown parties, but potentially stalked and followed.

---

[27] [Michigan State AD eyed Mel Tucker separation before season, sources say - ESPN](#)
[28] Termination letter from AD Haller to Neil Cornrich dated September 27, 2023.

160. Posted on September 10, 2023, by Zach Smith, former Ohio State University wide receiver's coach who was fired in 2018 for domestic violence against his ex-wife.



161. Texted to Tracy's personal cell phone on October 8, 2023, by an anonymous party who had Tracy's family member's home addresses (redacted for confidentiality purposes). Photos of Tracy and her family's personal residences were also sent.



162. Sent to Tracy's personal Cash App account by a recently paroled felon.



163. Tracy and her non-profit (STE) received hundreds of hateful and threatening messages across all social media platforms including X (formerly known as Twitter) Facebook, Blue Sky, LinkedIn and Instagram. [29]



---

[29] Tracy's identity has been impersonated on multiple pornographic websites, some exhibiting extreme violent behavior.

164. Per the RVSM, a Zoom hearing (Hearing) was scheduled for October 5 and 6, 2023. Both parties submitted proposed witness lists and identified their advisors and support person. The RO determined which of the parties' named witnesses were relevant.

165. Tucker originally designated David Zacks (Zacks) as his support person. Zacks is general counsel for Nationwide Wholesale Mortgage (NWM) owned by Mat Ishbia, the billionaire MSU donor who donated most of Tucker's coaching salary to MSU Athletics. Tucker had previously also listed Zacks on his witness list.

166. Zacks directed OIE to include him on any communications from the start of the investigation. Until Tracy's investigative file was released to her on July 16, 2023, Tracy was unaware that OIE had been communicating with Zacks from the date of Tracy filing her complaint in December 2022. [30]

167. OIE communicating details of a confidential RVSM investigation to the general counsel of a major MSU donor who contributes to Tucker's salary, without informing Tracy, gives the appearance of impropriety and a conflict of interest.

168. Upon information and belief, based on Vassar's own representations, she has a close personal and professional relationship with Ishbia.

169. The purpose of the hearing is not fact-finding, but for the RO to evaluate the evidence gathered by the Investigator and the witness statements taken at the hearing to determine if

---

[30] BT_MT OIE file – Redacted – Final.pdf, p229-230.

there has been a violation of the RVSM policy. The parties' advisors and the RO ask questions of the other parties and witnesses.

170. In September 2023 Tucker notified OIE that he had a medical condition preventing him from participating in the Hearing. OIE instructed Tucker to submit written documentation of his medical condition to the RO and request that the October hearing date be postponed. Tucker did not make the request or submit the requested documentation.

171. On September 18, 2023, Tucker notified the OIE Hearing Administrator that he became aware of allegedly newly discovered evidence.

172. On September 21, 2023, the OIE Hearing Administrator notified Tucker that he could request that the hearing be postponed for good cause to give Tucker time to review the alleged newly discovered evidence, and to submit a request in writing.

173. By September 29, 2023Tucker had collected all the alleged newly discovered evidence. Tucker never made a written request to postpone the hearing.

174. On October 5, 2023, Tracy and her counsel appeared for the hearing that began at 9:00 am ET. Neither Tucker nor his counsel were at the hearing. Tucker did not notify the RO that he would not be there.

175. Instead, Tucker released the alleged newly discovered evidence during the hearing (at approximately 9:15 am ET) to national media, the MSU Board of Trustees, and Woodruff.

176. The alleged newly discovered evidence was taken from the personal cell phone of Tracy's deceased best friend and business manager Alvarado, that was in the possession of Alvarado's estranged husband.[31]

177. Tracy and Alvarado were best friends for more than twenty years, and Alvarado was also Tracy's business manager. The phone contained both personal and confidential business communications between them, as well as confidential communications with other survivors that Tracy consulted with and advised.

178. Tracy was unaware that the alleged newly discovered evidence was publicly released until Tracy's counsel started receiving text messages from journalists informing her of the release of the alleged newly discovered evidence.

179. Tucker intentionally chose not to appear at the hearing, knowing that Tracy and her counsel would be in attendance. Tucker released the alleged newly discovered evidence during the hearing, knowing that Tracy and her counsel would be taken by surprise and not be able to respond.

180. Tucker sandbagged Tracy in an egregious attempt to publicly humiliate her.

181. Despite the attempt to humiliate her, Tracy remained in the hearing which went on without Tucker.[32] The hearing concluded at approximately 3:00 pm ET.

---

[31] Alvarado and her husband were estranged, separated for more than a year, and initiating divorce proceedings due to infidelity and him having a baby with another woman.
[32] Per the RVSM, neither party is required to attend the hearing, and cannot be compelled to do so.  Failure to attend the hearing on its own cannot be used as a negative inference by the RO.
MSU Relationship Violence & Sexual Misconduct and Title IX Policy, Sec. XIII, September 26, 2023.

182. In addition to the release of alleged newly discovered evidence, Tucker stated he had only released a portion of the alleged newly discovered evidence, and he threatened to release more of the alleged newly discovered evidence.

183. The passages of the alleged newly discovered evidence were selectively chosen and presented out of context. Tracy had no way of knowing what other alleged newly discovered evidence Tucker possessed or planned to release.

184. Knowing that confidential information belonging to other survivors could potentially be released, Tracy's non-profit *Set the Expectation,* and her corporation *Brenda Tracy LLC* filed an action in Ingham County Circuit Court requesting an immediate temporary restraining order (TRO) to prevent Tucker from releasing any more of the newly discovered evidence he claimed he had.  The court issued an *ex-parte* TRO restricting Tucker from releasing any more of the alleged newly discovered evidence. A permanent Protective Order was later issued with the consent of all the parties. The circuit court consent Protective Order remains in place.

185. During the hearing, Tracy's counsel received an email from the Prosecuting Attorney (PA) who handled Tracy's gang rape prosecution in 1998. The PA informed Tracy's counsel that a Private Investigator named William Kowalski contacted the PA inquiring about the 1998 gang rape.

186. William Kowalski is the same private investigator who assisted Tucker in obtaining Alvarado's cell phone.

187. The defendants have taken no steps whatsoever to address the release of the confidential information from Alvarado's phone.

188. The RO's decision was issued on October 25, 2023. The RO concluded that a preponderance of the evidence established that respondent [Tucker] violated RVSM Section III.a (Sexual Harassment) and RVSM Section III.B.5 (Sexual Exploitation.)  The RO's decision was based upon the following grounds:

    A.   Respondent subjected Claimant to unwelcome conduct based on sex when he Facetimed video called Claimant without a shirt on; when he attempted to meet up with Claimant alone following the Spring Game; and when he non-consensually masturbated and used graphic, sexual language on a phone call with Claimant.

    B.   Claimant reasonably believed that her rejection of Respondent's advances carried negative consequences for her/STE's involvement with MSU football and University Athletics.

    C.   Respondent's unwelcome behavior was sufficiently severe, persistent, and pervasive to create a hostile environment for Claimant by unreasonably interfering with her work and her ability to provide services as a vendor to University athletics. [33]

189. On November 8, 2023, Tucker appealed the RO's decision that Tucker had violated the RVSM. MSU appointed an independent Equity Review Officer (ERO) to decide Tucker's appeal.  Tracy, the Investigator, and the RO, responded to Tucker's appeal. On January 10, 2024, the ERO issued a decision summarily denying Tucker's appeal.

190. When Tracy's counsel approached Quinn regarding Tracy's complaint against Tucker, her counsel was clear that Tracy was not seeking monetary compensation for Tucker's harassment. Tracy wanted MSU to know that their football coach acted inappropriately so that MSU could take whatever action deemed necessary. Tracy made this report in good faith.

191. Tucker falsely accused Tracy's counsel of collusion with the Board of Trustees.

---

[33] Resolution Officer's decision issued October 25th, 2023.

192. Tucker falsely accused Tracy's counsel of collusion with Quinn after Quinn allegedly refused to comply with Tracy's counsel's demand for monetary compensation.

193. MSU commissioned the law firm Jones Day (JD) to investigate and provide a report (JD Report) regarding the "leak" of the Plaintiff's identity, as well as the leak of the confidential email from Tracy's counsel to Quinn.[34]

194. The JD Report identified applicable university policies and state laws prohibiting MSU Trustees from disclosing the existence of an OIE investigation: The MSU's Relationship Violence and Sexual Misconduct Policy ("RVSM"), the MSU Board of Trustees' Code of Ethics and Conduct, and the MSU Board of Trustees' Conflict of Interest Policy.

    A. The *RVSM Policy*, which applies to all "members of the MSU community," states:

> "The University will seek to protect the privacy of parties in compliance with applicable laws and regulations.  The University will keep private the identity of any individual who has made a report or formal complaint of prohibited conduct under this Policy; the identity of any claimant; the identity of any respondent; and the identity of any witness."[35]

    B. The *Code of Ethics and Conduct* requires Trustees "exercise responsible stewardship" and "uphold [their] fiduciary duties to the University and the State of Michigan."[36]

> Trustees commit to "maintain and respect the confidentiality of University records and information, including personnel information and student records," "not disclose nonpublic information, including privileged attorney/client communications, without proper authorization," and "not misuse or exploit for personal benefit any records or information to which [they] obtain special access as a result of [their] position."[37]

---

[34] Microsoft Word - Report of Investigation(1538932012.6).docx
[35] RVSM Policy at § IX
[36] Code of Ethics and Conduct at ¶ 5
[37] *Id.* at ¶ 6

    C. The *Conflict of Interest Policy* requires Trustees to act as fiduciaries to the University and avoid using information they receive as Trustees to advance their own interest in a manner that is inconsistent with the University's interests.[38]

195. The JD Report also referenced the Michigan criminal law Misconduct in Office.

"Any Trustee who, in the exercise of his or her official duties, misuses confidential information in a corrupt manner could potentially be prosecuted under the common law criminal offense of 'Misconduct in Office.'"[39]

196. On October 30, 2023, Trustee Brianna Scott (Scott) issued a public letter in which she alleged that Trustee Vassar violated numerous trustee policies.[40]

197. The MSU Office of Audit, Risk, and Compliance retained the law firm Miller & Chevalier (MC) to investigate and prepare a report (MC Report) on Scott's allegations against Vassar.[41]

198. On or about November 10, 2023, the identities of the two finalists in MSU's presidential search were leaked to the public.

199. After the presidential finalists' identities were leaked, MC expanded their investigation into the source of the leak.

200. MC's investigation found that "[I]t is likely that a Trustee or more than one Trustees were responsible for the leak to the media. Taken together, the evidence shows it is likely that a Trustee or more than one Trustees were responsible for the leak to the media."[42]

---

[38] *See* Conflict of Interest Policy at §§ I, IV.
[39] *People v. Couto*, 459 Mich. 348, 354 (1999)
[40] MSU trustee calls for board chair Vassar's removal over 'harmful consequences' of her bullying, plotting - The State News
[41] msu-independent-investigation-report--feb-28-2024--redactedupdated-links.pdf
[42] *Id.*

201. Journalist B that was given the leaked Draft Statement, also received the leaked information about the presidential search finalists.

202. Vassar and Denno refused to allow MC to inspect their cell phones during the investigation. All other trustees willingly allowed MC to inspect their phones.

203. MC determined that it was fair to assume that a report conducted by law firm Quinn Emanuel (QE report) was leaked in advance to the Detroit News. Three MSU employees and Vassar had access to the QE Report.

204. MC could not find sufficient evidence to confirm that the QE report was leaked to the Detroit News. However, the MC report expressly noted that Vassar refused to allow MC to inspect her phone which may have provided the ability to address factual gaps in Miller and Chevalier's investigation into the alleged leak.

205. Vassar herself told the MC investigators of other allegations, including "Trustees' leaks of confidential information to the press.

206. The MC Report made other critical findings regarding Vassar.

207. MC found that Vassar's participation in Name, Image, Likeness (NIL) negotiations with a major MSU donor (referenced in the report as Donor A) were a breach of the Trustee Conflict of Interest Policy and in breach of Article 7 of the BOT bylaws.

208. MC found that during a November 1, 2023, meeting, Vassar and Denno provided confidential information to students in breach which disregard the standards of ethical behavior expected of a Trustee and constitute a violation of Standard 8 of the Code of Ethics and of their fiduciary duties to MSU under standard 5 of the Code of Ethics.

209. MC found that on November 14, 2023, Denno provided students with contact information for a Detroit News reporter and instructed the students to tell the reporter that "Dr. Z is a racist."[43]

210. MC found that Trustee Denno's and Chair Vassar's efforts to direct students to publicly label Dr. Z a racist contravene their duties as MSU fiduciaries.

211. MC obtained recordings of Vassar and Denno's meeting with students in which Vassar said that "if you want to elevate their agenda, they need to do so through 'the hammer or the carrot' [referring to the administration] '[t]hey only know the hammer. They literally have used it. ***Press is the way to go***. They smeared me in the press. So, if there is a mechanism, then that is the one.'"

212. In the same meeting Denno stated that "the way to embarrass them [referring to MSU administration] is by 'press, media…. They hate that. They hate being publicly embarrassed.'"

213. MC's recommended corrective actions "may range from censure to referral to the Governor for review and consideration pursuant to MCL 168.293."

214. MC recommended that both Vassar and Denno's violations of Board Policies and Bylaws be referred to the Governor.

215. In the MC investigation, Vassar alleged "interference with an ongoing investigation by trustees Knake Jefferson, Byrum, and Scott with outreach to and communication with Brenda Tracy and possibly her attorney either directly or through third parties."

216. This allegation is patently false and disparaging not only to Tracy and her counsel, but also to defendants.

---

[43] Dr. Z is a pseudonym.

217. These allegations of collusion are also alleged in Tucker's lawsuit against MSU.

> Upon information and belief, the Administration defendants personally collaborated with Tracy and her counsel and with OIE staff to develop a "factual record" designed to support her false claim against Plaintiff. There also is evidence that several Board members – Defendants Knake Jefferson, Byrum and Scott – engaged in improper and unauthorized discussions with Tracy and her counsel.[44]

218. Despite this continued false narrative put forth by Vassar and Tucker, MSU has never responded to the false allegations leaving Tracy subjected to continuous attacks on her character as someone that extorts money to support herself.

219. Tracy initiated a retaliation claim against Tucker based upon the discovery of the private investigator making inquiries into Tracy's history, and the release of confidential information during the Hearing.

220. After taking 8 months to 'evaluate' Tracy's report of retaliation, OIE determined that retaining a private investigator to secretly inquire into Tracy's personal history and 1998 gang rape, surreptitiously obtaining Tracy's deceased best friend and business manager's phone and disseminating defamatory and highly confidential information to national media and the MSU BOT fifteen minutes into the Hearing, did not constitute retaliation.

221. Tracy had to obtain an emergency temporary restraining order to prevent any further release of confidential information regarding Tracy and other survivors from her best friend's phone.

222. OIE closed the retaliation file with no further action.

223. Tracy learned that she was not the only one that feared retaliation from Tucker.

---

[44] Case No. 24-cv-00795, United States District Court Western Division

224. Former Director of Football Operations John Doe1 took over planning Tracy's July 2022 visit from John Doe 2 who had left the football program. Tracy named John Doe 1 and John Doe 2 as witnesses in the OIE investigation. John Doe 1 initially met with the Investigator in January 2023.

225. John Doe 1 told the Investigator that Tucker asked John Doe 1 "Can we cancel that?" referring to the July 2022 visit. John Doe 1 responded "Yes."

226. During John Doe 1's interviews with the Investigator, John Doe 1 expressed several concerns:

    A. John Doe 1 found it "bizarre", and it made him uncomfortable that Tucker asked if John Doe 1 knew Tracy's phone number, and asked John Doe 1 to send it to him. John Doe 1 texted Alvarado's number to Tucker and then deleted the text. John Doe 1 stated further "there's a concern when someone in a position of power is asking you for things that make you uncomfortable" and "John Doe1 feared that regardless of the result of the Investigation his professional career will be impacted by what is public."

    B. John Doe 1 found it "bizarre "and it made him uncomfortable that Tucker asked John Doe 1 if there was a formal contract with Tracy.

    C. John Doe 1 stated that the uncomfortable feeling he had was because there had been "Rumors circulating about Respondent's [Tucker] social life and extracurricular activities."

    D. John Doe 1 expressed concerns that John Doe 1 would lose his job if Tucker was fired, and John Doe1's privacy and livelihood is being put in peril because of someone else's actions, resulting in this investigation."

227. On September 30, 2023, and again on October 2, 2023, John Doe 1 confirmed his attendance at the October 5, 2023, hearing with the Director of Resolution Services.

228. On October 2, 2023, John Doe 1 alleged retaliation to the Director of Resolution Services. As a mandatory reporter, the Director of Resolution Services submitted a report of alleged retaliation to OIE and the Title IX Coordinator.

229. On October 4, 2023, John Doe 1 notified the Director of Resolution Services that John Doe 1 would not attend the hearing. The Hearing Officer held John Doe 1's 2 pm EST reserved spot. John Doe 1 did not appear at the hearing.

## COUNT I
## BREACH OF STAUTORY DUTY AS TO ALL DEFENDANTS

230. The preceding paragraphs are incorporated by reference.

231. The defendants have a statutory duty created by their own Relationship Violence and Sexual Misconduct Title IX Policy (RVSM) to keep both the claimant and respondent's identity private.

232. Per the RVSM "The University will seek to protect the privacy of parties in compliance with applicable laws and regulations.  The University will keep private the identity of any individual who has made a report or formal complaint of prohibited conduct under this Policy; the identity of any claimant; the identity of any respondent; and the identity of any witness."

233. Defendants breached their duty to keep the parties' identities confidential, by disclosing the plaintiff's identity to outside parties.

234. Defendants breached their duty to keep the plaintiff's identity confidential by sharing details of the RVSM investigation with outside parties without the knowledge or consent of the plaintiff.

235. Defendants' breach of duty is the actual and proximate cause of damage(s) to the plaintiff.

236. As a direct and proximate result of the defendants' conduct, Tracy has suffered the following injury and damages, emotional and mental distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, humiliation, loss of enjoyment of life, loss of earnings, fractured family and personal relationships, and future expenses for medical and psychological treatment and therapy

## COUNT II

## BREACH OF THE MICHIGAN STATE UNIVERSITY BOARD OF TRUSTEES
## CODE OF ETHICS AND CONDUCT

237. The preceding paragraphs are incorporated by reference.

238. The defendants have a fiduciary duty to abide by their own Code of Ethics and Conduct.

239. The Code of Ethics and Conduct states that "We will avoid conflicts of interest and appearances of impropriety and otherwise conduct ourselves in a manner that conforms with the Board of Trustees Conflict of Interest Policy."

240. The defendants' own internal investigations found multiple instances of defendants in breach of their fiduciary duties.

241. The defendants' multiple breaches of fiduciary duty are the actual and proximate cause of damages to the plaintiff.

242. As a direct and proximate result of the defendants' conduct, Tracy has suffered the following injury and damages, emotional and mental distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, humiliation, loss of enjoyment of life, loss of earnings, fractured family and personal relationships, and future expenses for medical and psychological treatment and therapy.

## COUNT III

## MISCONDUCT IN OFFICE AS TO DEFENDANTS

## VASSAR AND DENNO

243. The preceding paragraphs are hereby incorporated by reference.

244. As duly elected public officials, defendants Vassar and Denno have a duty to abide by university policies, as well as applicable state and federal criminal statutes.

245. Under Michigan law, a university trustee carries additional responsibilities and burdens as public officials. *People v. Coutu*, 459 Mich. 348, 354 (1999).

> As such, any Trustee who, in the exercise of his or her official duties, misuses confidential information in a corrupt manner could potentially be prosecuted under the common law criminal offense of "Misconduct in Office." *Id.*

246. Under Michigan Law, Misconduct in Office is a common-law criminal offense, not explicitly defined by statute.

> Any person who shall commit any indictable offense at the common law, for the punishment of which no provision is expressly made by any statute of this state, shall be guilty of a felony, punishable by imprisonment in the state prison not more than five years or by a fine of not more than $ 10,000.00, or both, in the discretion of the court.

247. Misconduct in office refers to any improper or wrongful conduct by a public official while performing their duties.

248. Misconduct in office includes but is not limited to criminal activities related to public duties, willful neglect of duty, and violations of conflict of interest.

249. Misconduct in office includes malfeasance, misfeasance, and nonfeasance.[45]

---

[45] Michigan Municipal League Fact Sheet, Ethics—Misconduct in Office by Public Officers, November 2024. MML.org, x-2024-FS-Ethics-misconduct-in-office

250. Defendants' own internal investigation (JD report) identified potential misconduct in office by Vassar and Denno.

251. The individual defendants' misconduct in office constitutes a breach of defendants' fiduciary duty to the MSU community at large, and Tracy specifically.

252. The individual defendants' misconduct in office is the actual and proximate cause of injuries and damages to Tracy.

253. As a direct and proximate result of the defendants' conduct, Tracy has suffered the following injury and damages, emotional and mental distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, humiliation, loss of enjoyment of life, loss of earnings, fractured family and personal relationships, and future expenses for medical and psychological treatment and therapy.

## COUNT IV
## VIOLATION OF 42 U.S.C. § 1983 AND THE 14TH AMENDMENT
## SUBSTANTIVE AND PROCEDURAL DUE PROCESS
### *As to the Individual Defendants Vassar and Denno*

254. The preceding paragraphs are hereby incorporated by reference.

255. At all times relevant to this complaint, the MSU BOT and the individual defendants were the highest-ranking officers within the administration, and were responsible for the decision making, implementation, and management of issues arising under the RVSM, Title IX, and corresponding state law.

256. At all times relevant to this complaint, the 14th Amendment of the United States Constitution has protected an individual's right to be free from governmental action that "shocks the conscious" and deprives a person of judicial protection to redress wrongful governmental conduct.

257. In addition, the 14th Amendment protects an individual's right to security and safety in their bodily integrity.

258. Collectively, the 14th Amendment operates to prevent a person from enduring bodily harm imposed by governmental entities, and from being foreclosed against seeking redress for that harm.

259. As the highest-ranking members of the MSU administration, the MSU BOT and the individual defendants are responsible and have the ultimate authority to train and supervise employees, faculty, representatives, and/or agents, in the appropriate manner and methods to document, report, investigate, communicate, and prevent sexual misconduct, sexual assault and/or abuse involving university students and employees, including sexual misconduct occurring within a university property or program.

260. At all times relevant to this complaint, the individual Defendants had a duty to train and supervise employees, faculty, representatives, and/or agents, in the appropriate manner and methods to document, report, investigate, communicate, and prevent sexual misconduct, sexual assault and/or abuse involving university students, employees, and invitees, including sexual misconduct occurring within a university property or program.

261. At all times relevant to this complaint, the individual Defendants had a duty to comply with their own internal policies, codes of conduct, and applicable state and federal law.

262. At all times relevant to this complaint, the University individual Defendants had policies in place related to the prevention, detection, and correction of sexual misconduct, and the individual Defendants, as the highest-ranking members of MSU, were responsible for enforcement of these policies and procedures. The failure of the Individual Defendants regarding these policies and procedures amounts to deliberate indifference and the complete absence of care.

263. These failures and the resulting harm shock the conscience.

264. The Individual Defendants knew or should have known that Tucker posed a potential threat to the MSU community at large, and to plaintiff specifically.

265. The individual Defendants knew or should have known that the disclosure of confidential information would cause harm to the Plaintiff.

266. As a direct and proximate result of the individual Defendants' acts and omissions, Plaintiff has sustained injuries and damages.

267. As such, the Defendants are liable to Tracy for deprivations of Tracy's Constitutional rights to due process and bodily integrity.

268. As a direct and proximate result of the defendants' conduct, Tracy has suffered the following injury and damages, emotional and mental distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, humiliation, loss of enjoyment of life, loss of earnings, fractured family and personal relationships, and future expenses for medical and psychological treatment and therapy

## COUNT V
### Breach of Contract as to Defendant BOT

269. The preceding paragraphs are incorporated by reference.

270. Tracy had a valid and enforceable contract with Tucker to appear on campus on July22, 2023 to present to the MSU football team for which she would be paid $10,000 dollars.

271. Tucker, as an agent of MSU, had express authority to enter into contractual agreements with outside vendors on behalf of MSU.

272. Tucker, as an agent of MSU, materially breached the contract by canceling the scheduled appearance on July 22nd, 2023.

273. As a result of the breach, Tracy has actual damages of $10,000 dollars, and consequential damages from the loss of prospective MSU appearances, and appearances at other colleges and universities.

274. As a direct and proximate result of the defendants' conduct, Tracy has suffered the following injury and damages emotional and mental distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, humiliation, loss of enjoyment of life, loss of earnings, fractured family and personal relationships, and future expenses for medical and psychological treatment and therapy

## COUNT VI
## Tortious Interference with Contract

275. The preceding paragraphs are incorporated by reference.

276. Tracy had a valid and enforceable contract with defendants, through their agent Tucker to appear on campus on July 22, 2023, to present to the MSU football team for which she would be paid $10,000 dollars.

277. MSU, through their agent Tucker, tortiously interfered with and breached the contract by abruptly canceling the scheduled appearance on July 22nd, 2023.

278. Defendant MSU BOT tortiously interfered with other contracts between the plaintiff and other entities such that because of the malfeasance and nonfeasance of the defendants, plaintiff has lost immeasurable contracts with other entities.

279. As a result of the breach, Tracy has actual damages of $ 10,000 dollars and consequential damages from the loss of prospective MSU appearances, as well as appearances at other colleges and universities.

280. As a direct and proximate result of the defendants' conduct, Tracy has suffered the following injury and damages emotional and mental distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, humiliation, loss of enjoyment of life, loss of earnings, fractured family and personal relationships, and future expenses for medical and psychological treatment and therapy

## COUNT VII
### Gross Negligence

281. The preceding paragraphs are incorporated by reference.

282. Defendants had a duty of care to the university-at-large, as well as contractors, vendors, and other invitees to MSU.

283. Plaintiff was a contractor and invitee to MSU.

284. Defendants breached their duty of care by disclosing Plaintiff's identity to outside parties, contrary to their own internal policies and procedures.

285. Defendants breached their duty of care by failing to address the harassment and threats directed at plaintiff because of defendants' improper disclosures.

286. Defendants' actions demonstrate a conscious indifference to the safety and well-being of the plaintiff, a reckless and conscious disregard for the plaintiff's rights, and a blatant disregard for the potential consequences of their actions.

287. Defendants' actions demonstrate a significant departure from the standard of care.

288. Defendants' breach of the duty of care is the actual and proximate cause of plaintiffs' damages.

289. As a direct and proximate result of the defendants' conduct, Tracy has suffered the following injury and damages, emotional and mental distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, humiliation, loss of enjoyment of life, loss of earnings, fractured family and personal relationships, and future expenses for medical and psychological treatment and therapy.

WHEREFORE, Plaintiff respectfully requests judgment in her favor and against Defendants as follows:

A. Compensatory damages for Plaintiff's psychological and emotional distress, physical manifestation of emotional distress, embarrassment, loss of self-esteem, humiliation, loss of enjoyment of life, prevention of obtaining full enjoyment of life, loss of earnings past, present, and future, loss of earning capacity, past, present, and future expenses for medical and psychological treatment and therapy.

B. Punitive damages.

C. Injunctive relief requiring Defendants to take effective steps to prevent sex-based discrimination and harassment, including sexual assault, in all its programs and activities; fully investigate conduct that may constitute sex-based harassment and/or sexual assault; mitigate the effects of harassment and/or assault including by eliminating any hostile environment that may arise from or contribute to it.

D. Statutory interest.

E. Costs.

F. Reasonable attorney fees.

G.  Such other relief as the court deems appropriate.

**JURY DEMAND**

Now comes Plaintiff by and through her attorney, Karen Truszkowski and demands a trial by

jury.

Respectfully submitted,


By: /s/ *Karen Truszkowski*
_____
Karen Truszkowski (P56929)
TEMPERANCE LEGAL GROUP
Attorney for Plaintiff
503 Mall Court # 131
Lansing MI 48912
844.534.2560
karen@temperancelegalgroup.com